IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEVEN W. WHITE,       §
      *Plaintiff,*       §
             §
v.       §       CIVIL ACTION NO. H-07-2126
             §
MICHAEL ASTRUE,       §
      *Defendant.*       §

### AMENDED MEMORANDUM OPINION AND ORDER

The Court **GRANTS** the parties' joint motion to amend order (Docket Entry No. 18) and issues the following Amended Memorandum Opinion and Order.

Pending before the Court in this appeal from a denial of Social Security disability and supplemental income benefits are Plaintiff's Motion for Summary Judgment (Docket Entry No. 11) and Defendant's Motion for Summary Judgment (Docket Entry No. 12). The Court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the Court **GRANTS** Plaintiff's motion, **DENIES** Defendant's motion, and **REVERSES** the decision of the administrative law judge, as follows.

### I.   CASE BACKGROUND

#### A.   Procedural Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration

("Commissioner") regarding his claims for disability and supplemental income benefits under Title II of the Social Security Act ("the Act").

Plaintiff filed his applications for disability and supplemental income benefits on November 13, 2003. At a hearing held on March 7, 2006, the administrative law judge ("ALJ") heard testimony from Plaintiff, his mother, two medical experts ("ME"), and a vocational expert ("VE"). Tr. 466-554. In his decision issued on September 9, 2006, the ALJ found that Plaintiff was not disabled as of November 13, 2003, and that he had a residual functional capacity to perform simple, routine work with one or two step instructions within a supervised, low stress environment. Tr. 19.

The Appeals Council denied Plaintiff's request for review. Accordingly, the ALJ's decision became the Commissioner's final decision for purposes of this Court's review.

### B.    Factual Background

At the ALJ hearing held March 7, 2006, Plaintiff's counsel presented a synopsis of the case. He stated that Plaintiff was born on March 28, 1962, and graduated high school through a special education program. Tr. 469. IQ tests administered when he was sixteen years of age revealed an IQ of 66. His first job in 1989, working at a pizza restaurant, ended after just a few weeks. His second job in a fast-food restaurant quickly ended when his mother found him cleaning the grout in the men's restroom with a toothbrush. During 1999 to 2004, he worked as a Krogers grocery sacker and cart collector. During periods of

unemployment, Plaintiff ran unpaid errands at his father's office, picking up lunches for the employees. *Id.*

In November of 2003, Plaintiff began experiencing medical problems that were later diagnosed as atrial fibrillation[1] and congestive heart failure.[2]  Counsel asserted November 13, 2003, as the date of onset for Plaintiff's disability.  Tr. 470.  Plaintiff's manager at Krogers, who also had a special needs child, continued Plaintiff's employment on a part-time basis from November 2003 until July 2005. *Id.*  The manager gave Plaintiff frequent, extra work breaks, and lowered his expected work production standards.  Plaintiff's income averaged S569 per month in 2004 and $500 per month in 2005.  Tr. 471.  Finally, on July 17, 2005, Plaintiff was unable to meet even his reduced performance standards, and he stopped working. *Id.*  Counsel argued that Plaintiff met or equaled the disability listing under section 12.05 for the impairment of mental retardation. *Id.*

Plaintiff's testimony at the hearing established that he was 43 years old and lived with his parents.  Tr. 473.  He described his work limitations and the difficulties he experienced

---

[1]Atrial fibrillation occurs when the atria (upper chambers of the heart) quiver continuously in a chaotic pattern, causing a totally irregular, often rapid, ventricular rate.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 625 (28th ed. 1994).

[2]Congestive heart failure is a clinical syndrome due to heart disease, characterized by breathlessness and abnormal sodium and water retention, often resulting in edema (the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body). The congestion may occur in the lungs or peripheral circulation or both, depending on whether the heart failure is right-sided or general.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 567, 650 (28th ed. 1994).

with customers and other employees at Krogers. Tr. 480. He stated that, when he became tired, frustrated, or angry, or customers became frustrated or angry with him, his manager would "stick up" for him. *Id.* Plaintiff had difficulty testifying to specific dates or durations of time at the hearing, and gave either inconsistent dates or was unable to provide answers for time-related questions. At one point, he testified that he graduated in 1981; at a later point, he stated he graduated in 1983. Tr. 481, 478. He was unable to state how long he worked at certain jobs or identify the year he worked certain jobs. Tr. 474, 475, 476, 479.

Plaintiff testified that he began having heart problems in November of 2003, and that the medical problems impacted his ability to perform work duties. When walking the Krogers parking lot to collect grocery carts, he would need to stop after walking twenty yards, as "I was just breathing so hard and my heart was racing so fast" and he "just couldn't keep up with it." Tr. 482. Plaintiff's manager reduced his work duties and placed him on a part-time work schedule. Tr. 483. The manager allowed Plaintiff to take frequent breaks, but Plaintiff testified that he found it necessary to take breaks every two or three hours, or even hourly on certain days. *Id.* Other employees were needed to help him carry boxes upstairs. Tr. 484. He tried sorting bread on the shelves but, confused by the tags and unable to read the small numbers on the wrappers, he was unable to complete the work. Tr. 485. Plaintiff frequently had to re-do certain job assignments, and other managers became upset with him. Tr. 486. He was unable to work a full eight-hour shift after November of 2003, and finally stopped working in July of 2005. Although he was on a medical leave of absence

4

from Krogers, he did not know if he would be allowed to return, as the store was under new management. Tr. 487-88.

Plaintiff testified that his cardiologist told him that he had a leaky heart valve that needed to be fixed or replaced, and that he should not work any longer. Tr. 489. Plaintiff stated that, when he exerts himself, his heart starts racing, and that he can walk only half a block before needing to stop because he would get hot, tired, and sweaty. Tr. 490. He was hospitalized twice in 2004 for heart problems. During the first episode, he remained in ICU for a week with cardiac arrhythmia. Tr. 492. During the second episode, fluid accumulated around his heart and lungs, and he again remained in ICU for a week. *Id.* If he walks or stands for over an hour, his feet become swollen. His doctors have told him to rest and elevate his feet for two or three hours two or three times a day. Tr. 493. He can lift twenty pounds, but has difficulty bending or balancing himself while carrying anything up stairways. Tr. 493-94.

His parents handle his finances, as he cannot balance a checkbook or pay bills. Tr. 494-95. He testified that he can cook simple things such as eggs or make a sandwich, and enjoys barbecuing as a hobby. Tr. 495. He states that he can do certain household chores such as sweeping, making his bed, taking out the trash, and doing windows or the dishes. Tr. 496. Plaintiff's mother later testified that Plaintiff overstates his abilities, and that he cannot perform these activities. He does drive a car, and goes to church with his family. *Id.* He used to enjoy riding dirt bikes, but can no longer do it. Tr. 497. He can sit, but cannot

stand for over an hour, as his foot swells and he cannot walk. *Id.*; 502. He has several friends, and visits with them at a local coffee shop. Tr. 498. He drives to the coffee shop, which is located less than a mile from his home. *Id.* He recalled getting lost while driving once because of construction work. Tr. 499.

His mother reminds him to take his medications. *Id.* She sets out his pills in a medicine box labeled for each day of the week, with color-coded boxes for day and night. Tr. 500. Plaintiff testified that he would not be able to live on his own at this time. Tr. 502. His parents give him an allowance of $50.00 per week for doing household chores. He currently takes Darvocet pain medication once or twice a day, which he believes is for his foot pain. Tr. 503.

Plaintiff's mother testified that Plaintiff was a special education student during school. Tr. 505. He worked at Krogers with "very, very short hours," but became very frustrated when he was unable to complete his assigned work duties. Tr. 506. She testified that, although Plaintiff had stated he worked at the pizza restaurant for over a year, he actually worked there for only a few weeks. Tr. 507. She stated that Plaintiff has difficulty with time concepts. He ran errands at his father's used car business, but was not paid. They tried letting him wash and vacuum the cars, but he was unable to do the work properly. Tr. 509. She stated that it is very difficult for Plaintiff to "stay on task." Tr. 511. He may unload the dishwasher, but she "never knows where the dishes are going to be." He cannot sort silverware or put it away correctly. If he takes a break from an assignment, he forgets what

he was doing. He would not be able to roll silverware without constant supervision. Tr. 512. She stated that she once sent Plaintiff to the corner grocery store to buy two bananas. He returned an hour later, frustrated and upset because he could not find a bunch with only two bananas. Tr. 513. He did not realize that he could break apart a larger bunch. *Id.*

Plaintiff's mother further testified that, even though she organizes Plaintiffs medications into separately-labeled compartments with two different colors for daytime and nighttime, he takes the wrong medications. She needs to continually check and monitor his medications, his weight, and his heart rate. Tr. 514. She testified that Plaintiff needs a very structured environment, and doubts he could ever live on his own. *Id.* It took her a full year to teach Plaintiff to drive a car, and that driving "sticks" with him because he drives daily. Tr. 515. He drives only short distances to familiar places such as church, the local grocery store, the coffee shop, or the local hospital for his blood work. Tr. 516. He has gotten lost more than one time. *Id.*

She further testified that Plaintiff was able to keep his job at Krogers because the manager understood his situation and provided him greater assistance and more frequent breaks than usual. Tr. 517. Without that particular manager's help and understanding, Plaintiff would not have been able to continue working. After the supportive manager was transferred and Plaintiff began experiencing his heart problems, the replacement manager "never let [Plaintiff] work another day." Tr. 518. She stated that his "friends" are actually neighborhood retirees that meet for coffee every morning. He tends to be overly friendly

7

with new people, which can make them uncomfortable. Tr. 519. He does not comprehend what he reads, and generally looks at magazine pictures and the words underneath them. *Id.* He cannot perform household chores unsupervised and cannot perform them properly or completely. Tr. 521. Plaintiff likes to "barbecue" because he likes building the fire; they do not eat the resulting burned or raw products. *Id.* She walks with him on his daily walks, and he cannot walk longer than five minutes without starting to perspire with labored breathing.

Plaintiff's internist, Dr. Gretchen Wick, testified at the hearing as a ME, and stated that Plaintiff has diabetes, high blood pressure, a hiatal hernia,[3] gastroesophageal reflux disease (GERD),[4] and two cardiac conditions of atrial fibrillation and mitral regurgitation.[5] Tr. 523. His ejection fraction was within normal range.[6] Tr. 524. An echocardiogram performed in August of 2003 revealed mitral valve prolapse (MVP)[7] with moderate mitral

---

[3]A hiatal hernia is the abnormal protrusion of an abdominal organ, usually the stomach, through the esophageal gap of the diaphragm. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 765 (28th ed. 1994).

[4]GERD is the reflux of the stomach and duodenal contents into the esophagus, which occurs as a chronic pathological condition. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1605 (30th ed. 2003).

[5]Mitral regurgitation is the backflow of blood from the left ventricle to the left atrium of the heart due to mitral valve prolapse. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1443 (30th ed. 2003).

[6]"Ejection fraction" is a measure of the efficiency of the heart's ventricles. It is the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 660 (28th ed. 1994). Its normal range is 57-73%, with lower values indicative of ventricular dysfunction. *Id.*

[7] MVP is the redundancy or hooding of mitral valve leaflets so that they prolapse, or fall back, into the left atrium, often causing mitral regurgitation. MVP is often asymptomatic but

8

regurgitation and a markedly dilated left atrium. *Id.*; 525.  In 2004, during Plaintiff's second

hospitalization, tests revealed atrial fibrillation with moderate to severe mitral regurgitation.

Tr. 526.  In October of 2005, he was found to have atrial fibrillation, mitral regurgitation, and

cardiomyopathy evidenced by an enlarged heart.  Tr. 527.  His cardiologist restricted him to

lifting forty pounds or less, and ordered him to avoid extreme temperatures.  Tr. 529.  Dr.

Wick noted that Plaintiff was diagnosed with a left calcaneal valgus foot deformity in 1998,

a condition which caused an abnormal and difficult walking gait.  Tr. 528.  She stated that

Plaintiff was obese with a body mass index of 34, and that he had no history of using

tobacco, alcohol, or illicit drugs.  Tr. 529.

In discussing Plaintiff's disability, the ME was of the opinion that Plaintiff did not

meet or equal, singly or combined, the listing criteria for sections 4.05, 4.08, 4.07, 5.03, or

5.07.  Tr. 531.  She noted that Plaintiff's medical records reflected no restrictions other than

the forty-pound lifting and extreme temperature restrictions.  Tr. 533.

Plaintiff's second ME, psychologist Glen F. Sterns, testified that, according to his high

school records, Plaintiff functioned in the "mentally deficient" range, even though he met the

"mental retardation" criteria for educational purposes.  Tr. 537.  In discussing the tests and

evaluations undertaken by psychologist Ted Jolly, Sterns noted that Plaintiff had a full scale

IQ score of 76, with reading measured at a fifth grade level and spelling at a second grade

---

palpitations and chest discomfort may occur and in some cases progressive mitral regurgitation
necessitates valve replacement. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1466, 1761
(30th ed. 2003).

level, which constitute two and three standard deviations below the mean. *Id.* Similar testing

in 2005 revealed a full scale score of 65. Plaintiff was diagnosed with a developmental

coordination disorder with poor immediate visual retention. *Id.* His arithmetic skills tested

at a fifth grade level. Tr. 539. Jolly had concluded that Plaintiff was functionally disabled

and unable to take care of himself. Sterns stated that Plaintiff placed at three standard

deviations below the norm, which "probably then would fit very close to what Social Security

is talking about." *Id.* Sterns reviewed the listing disabilities under sections 12.04 (mood

disorders) and 12.05 (mental retardation), and noted that Jolly had diagnosed a non-specific

depressive disorder. *Id.*

The VE, Wallace Stanfield, testified that he believed Plaintiff was capable of simple

routine work with one or two step instructions, without need for reasoning, and within a

supervised, low stress environment. Tr. 546. Medium level postural limitations would be

required. *Id.* The VE stated that Plaintiff could perform past relevant work. Tr. 547. Other

relevant jobs would include a hand packer, laundry worker, and an industrial sweeper, for

which local and national availability numbers were provided. *Id.* The VE further testified

that, if the hypothetical were reduced to light level of unskilled work, relevant jobs would

also include small products assembler, fast food worker, or cafeteria attendant. Relevant

availability numbers again were provided. Tr. 548. On cross-examination, the VE admitted

that Plaintiff had not been performing all of the elements required for the courtesy checker

job, but stated that the job descriptions have great latitude. Tr. 550-51. The VE stated that,

although Plaintiff would be seriously affected or limited by his mental and functional impairments, he could still maintain employment on a competitive level without any additional assistance.  Tr. 551-52.

The VE testified to the following additional hypotheticals:

Q:     The same hypothetical, taking  – if the claimant is unable to meet competitive standards. same hypothetical physical wise, but with the mental limitations or unable to meet competitive standards  and remembering work like procedures, sustaining ordinary routine, without special supervision, performing at a constant pace, without unreasonable number and length of rest periods.  And responding appropriately to changes in a routine work setting?  Would an individual with those limitations, and unable to meet competitive standards as defined as patient cannot satisfactorily perform this activity independently, appropriately, [e]ffective or at the same basis in a regular work setting?  Would that individual be able to maintain past relevant work or any other?

VE:    Yes.

Q:     If more than two-thirds of the day – the same hypothetical, but add if more than two-thirds of the day, the claimant was unable to work without direct supervision.  Would he be able to maintain employment on a competitive level?

VE:    No.

Q:     And if more than two-thirds of the day the claimant's same physical criteria if [he] was unable to complete tasks on a timely manner for more than two-thirds of the day?  Would he be able to maintain?

VE:    He would not.  No.

Q:     Then based on the claimant's testimony if because of his fatigue, heart palpitations, if he was required to take more than the standard breaks, 15 minutes every four hours. Thirty minutes every eight hours.  Would

he be able to maintain either past relevant work or any work in the competitive?

VE:   He would not.  No.

Tr. 552-53.  In answering a question from the ALJ, the VE stated that the simple routine of two step instructions and the supervised, low stress environment would be the only restrictions that he could place on Plaintiff's employment limitations.  Tr. 553.

### C.   ALJ's Findings and Evaluations of the Evidence

The ALJ made the following findings with attendant explanations and evaluations of the evidence:

(1)   Plaintiff met the insured status requirements of the Act.  Tr. 16.

(2)   Plaintiff had not engaged in substantial gainful activity since November 13, 2003, the alleged onset date.  *Id.*

(3)   Plaintiff had a severe combination of impairments of diabetes mellitus, hypertension, and borderline intellectual functioning under sections 404.1520(c) and 416.920(c).  Tr. 17.

(4)   Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listing impairments under sections 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, or 416.926.  *Id.*

In making this fourth finding, the ALJ noted that the ME testified that Plaintiff's diabetes was under control with medication, and that he did not have any required condition

related to the diabetes. He further noted that, according to the ME, Plaintiff's hypertension was not attended by episodes of congestive heart failure, ischemic heart disease, or end-organ damage so as to meet or equal in severity the listing criteria under 4.03. The ME stated that Plaintiff's gastrointestinal impairment included intermittent solid food dysphagia with heartburn and indigestion, and that tests revealed gastroesophageal reflux disease and erosive gastritis. The ME stated, however, that these impairments, either singly or in combination, did not meet or equal a listing criteria. *Id.* The ME testified that Plaintiff's cardiac impairments included mild to moderate mitral regurgitation, with a normal ejection fraction. Plaintiff's cardiologist observed a markedly dilated left atrium and mild dilation of the left ventricle, but with a normal ejection fraction. The cardiologist noted only atypical chest pain. The ALJ opined that Plaintiff's atrial fibrillation was converted to sinus rhythm during his first hospitalization in May of 2004, and noted that the criteria for listed cardiac impairments were not present. Tr. 18.

The psychologist ME testified that, during Plaintiff's high school years, school administrators placed him in the mentally retarded category. He noted that Ted Jolly, who had a masters degree in psychology, not a doctorate, gave Plaintiff a full scale IQ score of 76 in 2004. Tr. 18. Dr. Hirsch, a doctorate-prepared psychologist, subsequently gave Plaintiff a full scale IQ score of 65 in 2005. According to the ALJ, the ME testified that none of the part B criteria for sections 12.04 or 12.05 were met, and that Plaintiff had only moderate restrictions in his activities of daily living and moderate difficulties in social

13

functioning, concentration, persistence, or pace. Tr. 19. The ME testified that Plaintiff met

the listing criteria under section 12.04(c)(3), as he had a current history of one or more year's

inability to function outside a highly supportive living arrangement with an indication of a

continued need for such an arrangement. *Id.* The ALJ, in expressly disagreeing with the

ME, stated the following:

> [The undersigned Judge] does not find this testimony to be credible.
> Specifically, the claimant has demonstrated that he retains the ability to
> function outside a highly supportive living arrangement. Specifically, the
> claimant has worked at a grocery store sacking groceries. When the claimant
> filed his application, he reported that on an average day, he spent most of his
> time sacking groceries and bringing in baskets from the parking lot of a store.
> Additionally, he testified that he made regular visits to a coffee shop to visit
> with friends. The claimant reported to Mr. Jolly that he liked to barbecue, ride
> a motor bike, swim, go to movies, and visit with friends. The claimant is able
> to drive. The claimant testified that he worked at a Krogers grocery store until
> July 2005. Thus, the claimant has demonstrated that he is able to function
> outside a highly supportive living arrangement.

Tr. 19.

(5)    Plaintiff has the residual functional capacity to lift and carry twenty pounds

occasionally and ten pounds frequently, stand and walk about six hours in an eight hour day,

and sit for at least six hours in an eight hour day. He is able to do only occasional stooping,

twisting, crouching, kneeling, and climbing of stairs or ramps. Plaintiff is limited to simple,

routine work with one or two step instructions, and a supervised, low stress environment.

Tr. 19.

In reaching this determination, the ALJ stated that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Tr. 20. The ALJ noted that, although Plaintiff had a prolapsed mitral valve, a markedly dilated left atrium, moderate to severe mitral regurgitation, pulmonary hypertension and left atrial enlargement, there was no evidence that these impairments caused Plaintiff any functional limitations. *Id.* The ALJ noted that Plaintiff was hospitalized in June of 2004 for congestive heart failure, mitral regurgitation, atrial fibrillation, pulmonary hypertension, diabetes mellitus, and exogenous obesity. Tr. 21. The ALJ opined that, because Plaintiff was diagnosed with atrial fibrillation, hypertension, and diabetes upon discharge from the hospital, Plaintiff's heart problems "had been successfully treated." He found that "the mental claimant's impairments" (sic) did not cause a substantial loss in Plaintiff's ability to respond appropriately to supervision, coworkers, and usual work situations. *Id.* Although psychologist Ted Jolly reported that Plaintiff was unable to meet competitive standards in the workplace in several areas, the ALJ gave Jolly's opinion little weight because it was without objective clinical findings and inconsistent with other evidence. Tr. 23. The ALJ noted that another of Plaintiff's treating physicians had reported that Plaintiff was incapable of maintaining even low stress jobs. *Id.* The ALJ afforded this opinion little weight because he found it unsupported by objective clinical findings and inconsistent with the evidence as a whole.

Plaintiff's psychologist, Dr. Hirsch, also was of the opinion that it was unlikely Plaintiff would be able to live on his own without special assistance. Tr. 24. Hirsch was of the further opinion that Plaintiff had marked restrictions in his abilities to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. *Id.* The ALJ discounted these and Hirsch's other, similar opinions because Plaintiff graduated high school, learned to drive, worked as a grocery sacker, and worked in automobile sales.[8] The ALJ also noted that Plaintiff's cardiologist stated in 2005 that Plaintiff should avoid performing the duties of a grocery courtesy clerk, and that a second doctor recommended in 2005 that Plaintiff not perform the duties required in his job description. Tr. 25. The ALJ discounted these opinions because, in *2004*, Plaintiff's atrial fibrillation had converted to sinus rhythm during his hospitalization, and in 2005, Plaintiff reported no palpitations, dyspnea, or fatigue. *Id.*

(6)     Plaintiff is not capable of performing past relevant work. Tr. 25.

(7)     Plaintiff was born on March 28, 1962, and was 41 years old on the alleged disability onset date, which is defined as a younger individual under the regulations. Tr. 25.

(8)     Plaintiff is a high school graduate and can communicate in English.

---

[8]There is no evidence whatsoever in the record that Plaintiff "worked in automobile sales." To the contrary, Plaintiff's father owned a used car business and sometimes allowed him to pick up lunches for the other employees. Plaintiff was not an employee of the business and was not paid for picking up the employees' lunches.

(9)     Transferability of job skills is not material to the determination of disability due to Plaintiff's age. Tr. 25.

(10)    Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform. Tr. 25-26.

(11)    Plaintiff had not been under a disability as defined in the Act from November 13, 2003, through the date of the ALJ's decision. Tr. 26.

## II.   STANDARD OF REVIEW AND APPLICABLE LAW

A motion for summary judgment under Federal Rules of Civil Procedure Rule 56 requires the Court to determine whether the moving party is entitled to summary judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). A genuine issue of material fact exists if a reasonable fact finder could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Id.*

Judicial review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether substantial evidence in the record supports the decision and whether the ALJ applied proper legal standards in evaluating the evidence. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). If the Commissioner's decision satisfies both of these requirements, it must be affirmed. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

## A.    "Substantial Evidence"

The widely-accepted definition of substantial evidence is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.* The Commissioner has the responsibility of deciding any conflict in the evidence. *Id.* If the findings of fact contained in the Commissioner's decision are supported by substantial evidence appearing in the record, they are conclusive, and this Court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the Court overturn it. *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the Court is to review the entire record, but may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Brown*, 192 F.3d at 496. In other words, the Court is to defer to the Commissioner's decision as much as possible without making its review meaningless.

18

## B.     Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving that he is disabled within the meaning of the Act. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423 (d)(3). A claimant is eligible for benefits only if the onset of the qualifying medical impairment began on or before the date the claimant was last insured. *Ivy v. Sullivan*, 898 F.2d 1045, 1948 (5th Cir. 1990).

To determine whether a claimant is capable of performing any substantial gainful activity, the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

(1)     a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are;

(2)     a claimant will not be found to be disabled unless he has a 'severe impairment';

(3)     a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors;

(4)     a claimant who is capable of performing work that he has done in the past must be found 'not disabled'; and

(5)     if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears the burden of proof on the fifth step. *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999); *Brown*, 192 F.3d at 498. The Commissioner can satisfy his burden either by reliance on the Medical-Vocational Guidelines of the Regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner satisfies his burden of proof as to the fifth step, then the burden shifts back to the claimant to prove he cannot perform the work suggested. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. *Greenspan*, 38 F.3d at 236.

## III.   ANALYSIS

In his motion for summary judgment, Plaintiff argues that he met or equaled the listing criteria for sections 12.05(C) and (D), and that the ALJ's findings to the contrary are unsupported by substantial evidence.

The pertinent portions of 20 C.F.R. Part 404, Subpart P, Appendix 1, section 12.05 provide as follows:

12.05 Mental retardation:   Mental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*   *   *   *

C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

D.   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1.   Marked restriction of activities of daily living; or

    2.   Marked difficulties in maintaining social functioning; or

    3.   Marked difficulties in maintaining concentration, persistence, or pace; or

    4.   Repeated episodes of decompensation, each of extended duration.

That Plaintiff's mental retardation impairment initially manifested prior to his twenty-second birthday is clear from the record, as evidenced by Plaintiff's 1979 full scale IQ score of 54. Tr. 239.

Under subpart (C), Plaintiff must establish a valid verbal, performance, or full scale IQ of 60 through 70. Plaintiff presented evidence of his 1979 full scale IQ score of 54 and his 2005 full scale IQ score of 65. The 2005 test was administered by Dr. Hirsch. Psychologist Ted Jolly administered an interim test in 2004, which reflected a full scale score

21

of 76. However, Jolly himself questioned the validity of that particular result, reporting that "there possibly may be some practice effect carried over from [an earlier] test as the tests are the same." Tr. 157. This comment is particularly salient in light of the eleven point drop in Plaintiff's score reported by Dr. Hirsch one year later. Under 20 C.F.R. Part 404, Subpart P, Appendix 1, section 12.00(D)(6)(a) regarding intelligence tests, "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." In addition to questioning the test's validity, Jolly reported that, "The best thing for [Plaintiff] is to continue to work at Krogers as long as he is allowed to. He is, however, functionally disabled and not likely to find work and retain it elsewhere." Tr. 159. Dr. Hirsch reported similar conclusions, and agreed with Jolly's conclusions regarding Plaintiff's functional disabilities.

The ALJ, however, accorded little weight to the analyses of Plaintiff's functional abilities proffered by Jolly and Dr. Hirsch. The ALJ opined that Plaintiff was "not retarded" because he graduated high school, learned to drive, worked as a grocery sacker, and worked in automobile sales. Tr. 24. The ALJ further noted that Plaintiff was able to

> cook, do dishes, clean house, vacuum, buy groceries and travel alone. [He] was able to visit friends, go to barbecues, and attend church. Thus, [Plaintiff's] activities of daily living indicate that he has a higher level of functioning than indicated[.]

*Id.*

22

These statements by the ALJ, which formed the basis for his discounting the psychologists' functional evaluations, reflect an improper evaluation of the evidence. As this Court noted earlier, there is no evidence in the record that Plaintiff "worked in automobile sales." At most, Plaintiff procured lunches for employees as an unpaid helper to his father. Plaintiff's father had tried letting him wash and vacuum cars, but Plaintiff was unable to complete the work properly. Tr. 509. Nor is there reliable evidence that Plaintiff can, or does, productively cook. To the contrary, the record shows that Plaintiff's "barbecuing" entailed the supervised lighting of a fire with production of inedible results; the activity was portrayed as a recreational pastime for Plaintiff, not a functional activity.

That Plaintiff overstates his own abilities, and has difficulties with concepts of time, is evinced clearly by the testimony of his mother and psychologists. Plaintiff cannot return dishes to their proper location in the kitchen, and cannot separate silverware. His attempts to perform household tasks meet with incomplete and ineffective results. He is unable to take his own medications at the proper times in the proper amounts. He cannot balance a checkbook or pay bills, and his ability to grocery shop is extremely limited. He can drive a car, but only for short distances and to familiar locations. The bulk of his socializing entails visiting neighborhood retirees at a local coffee shop. The evidence shows that, without substantial leeway, assistance, and support from the one manager at Krogers, Plaintiff would not have remained employed at the store. There is no evidence that Plaintiff would be allowed to return to his prior employment if his medical restrictions were removed, as his

23

prior manager is no longer at that location. The substantial evidence shows that Plaintiff is unable to live on his own, cannot function in a normal working environment, and experienced extreme difficulty working in even a well-sheltered environment. The psychologist ME testified at the hearing that Plaintiff had a current history of one or more year's inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. The ALJ, however, discounted this expert's opinion, finding instead that Plaintiff retained the ability to function outside a highly supportive living arrangement. In short, the ALJ's decisions to discount Plaintiff's IQ test results within the 60 to 70 range, and to discount the two ME's opinions regarding Plaintiff's functional abilities, are based on the ALJ's improper evaluation of the evidence and are not supported by substantial evidence.

Plaintiff argues that he meets the additional criteria of section 12.05(D) because he has a marked restriction in activities of daily living and marked difficulties in maintaining concentration, persistence, or pace. (Docket Entry No. 11, p. 16.) According to the testimony of ME Sterns, Plaintiff has *marked* difficulties in maintaining concentration, persistence, or pace. Tr. 542. This Court notes that the ALJ incorrectly found that ME Sterns reported only *moderate* deficiencies in concentration, persistence, or pace. Tr. 19. Therefore, the ALJ improperly evaluated ME Sterns's testimony and opinion. ME Sterns further stated that Plaintiff thinks that a task has been completed when it has not, such as washing only one side of a car; Sterns observed that mentally retarded individuals tend to

perceive a task as fully completed when they see that a portion has been completed. Tr. 543. The record shows that psychologist Jolly also reported that Plaintiff lacks the ability to follow through with tasks. Tr. 159.

In discounting these experts' observations, reports, and opinions, the ALJ found that Plaintiff retained the ability to function outside a highly supportive living arrangement. Tr. 19. As already stated, this finding is an improper evaluation of the evidence and is unsupported by substantial evidence. To the contrary, the substantial evidence shows that Plaintiff has a marked restriction in activities of daily living and marked difficulties in maintaining concentration, persistence, or pace.

For these reasons, the ALJ's findings that Plaintiff failed to meet the listing criteria for 20 C.F.R. Part 404, Subpart P, Appendix 1, section 12.05(D), is unsupported by substantial evidence, and the ALJ erred as a matter of law in denying Plaintiff's claim for disability and supplemental income benefits.

## IV.   CONCLUSION

Based on the foregoing, the Court **GRANTS** the parties' joint motion to amend order (Docket Entry No. 18), **GRANTS** Plaintiff's motion for summary judgment (Docket Entry No. 11), **DENIES** Defendant's motion for summary judgment (Docket Entry No. 12), **REVERSES** the Administrative Law Judges's decision, and **ORDERS** that Plaintiff be awarded disability and supplemental income benefits effective November 13, 2003.

25

The Clerk will provide copies to the parties.

Signed at Houston, Texas, on this the 14th day of July, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE